Filed 5/1/26  P. v. Herrera CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SERGIO GONZALEZ HERRERA,<br><br>Defendant and Appellant. | F088818<br><br>(Super. Ct. No. BF194929A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Michael C. Sampson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary, Eric L. Christoffersen, and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

At approximately 4:30 a.m., Sergio Gonzalez Herrera (appellant) unlawfully entered the residence of Maria G. (Maria), an 85-year-old woman. He went into her bedroom while she was asleep, barricaded the door, and violently raped and assaulted her. Approximately seven hours later, while still affected by the pain and trauma of the assault, Maria suffered a fall inside of her residence and was hospitalized with a fractured femur. Following surgery to repair the fracture, Maria developed multiple surgical complications and other medical conditions and passed away 12 days after the sexual assault.

A jury convicted appellant of first degree felony murder (Pen. Code, §§ 187, subd. (a), 189, subds. (a), (e)(1); count 1)[1] with special circumstance findings for murder in the commission or attempted commission of rape, sodomy, oral copulation, and burglary (§ 190.2, subds. (a)(17)(C), (a)(17)(D), (a)(17)(F), (a)(17)(G)), first degree burglary (§§ 459, 460, subd. (a); count 2) with a finding that another person was present inside the residence (§ 667.5, subd. (c)(21)), forcible rape (§ 261, subd. (a)(2); count 3) with findings that the rape was committed during a residential burglary (§ 667.61, subd. (d)(4)) and that appellant personally inflicted great bodily injury (*id.*, subd. (d)(6), § 12022.7, subd. (c)), forcible oral copulation (§ 287, subd. (c)(2); count 4) with a finding that the offense was committed during a residential burglary (§ 667.61, subd. (d)(4)), assault with intent to commit rape during the commission of a residential burglary (§§ 220, subd. (b), 261, subd. (a)(2); count 5), with findings that appellant personally inflicted great bodily injury (§§ 12022.7, subd. (c), 12022.8), assault with intent to commit oral copulation during the commission of a residential burglary (§§ 220, subd. (b), 287; count 6), assault with intent to commit sodomy during the commission of a residential burglary (§§ 220, subd. (b), 286; count 7), elder abuse likely to produce

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

great bodily harm (§ 368, subd. (b)(1); count 8) with findings that appellant proximately caused the death of a victim 70 years of age or older (*id*., subd. (b)(3)(B)) and personally inflicted great bodily injury (§ 12022.7, subd. (c)) and resisting an executive officer (§ 69; count 9).

The trial court sentenced appellant on count 1 to life in prison without the possibility of parole, plus a consecutive determinate term of three years on count 9. Sentence on the remaining counts, enhancements, and allegations was stayed pursuant to section 654.

On appeal, appellant contends there was insufficient evidence to sustain his felony murder conviction. He also contends the trial court committed instructional error and erroneously admitted testimonial hearsay in violation of his Sixth Amendment confrontation rights. We conclude substantial evidence supported the murder conviction and that any purported error was either absent or harmless. We affirm.

## BACKGROUND

### I. Sexual Assault and Arrest.

In November 2021, Maria lived in her home with her two grandsons, Felipe A. and Miguel A. Prior to the rape and assault, Maria was able to walk slowly, typically with the assistance of a walker. She was also able to cook and perform light household chores.

On November 24, 2021, around 4:30 a.m., Felipe was getting ready for work when he heard a noise in the backyard. He walked outside through the kitchen door and saw a man, later identified as appellant, attempting to pry open an electrical panel on the side of the house with a screwdriver. Felipe testified appellant appeared to be under the influence of drugs. When Felipe told appellant to leave, appellant moved past him and entered the house through the kitchen door, locking it behind him. Felipe looked through

3.

the window and saw appellant grab a kitchen knife, then walk down the hallway toward the bedrooms.

Miguel testified he was asleep in his room when appellant opened the door and walked inside. Appellant was holding two kitchen knives and stated there was a woman there who had been kidnapped. Appellant then ran into Maria's bedroom. Miguel located Felipe outside, and Felipe called the police.

Responding officers heard a man's voice inside of the house and a woman frantically screaming for help. The officers announced their presence and proceeded down the hallway as the woman continued yelling for help. The door to the bedroom was locked, and one of the officers forced entry by kicking it until it broke in half. The officers then discovered the door had been barricaded from the inside with furniture.

Once the officers were able to enter the bedroom, they saw Maria lying on the ground and appellant backing away from her. Appellant was shirtless, and repeatedly yelled, "[T]hat's my mom." Maria was pulling down her nightgown to cover herself and was begging for help. Officers ordered appellant to get on the ground and put his hands behind his back. When appellant failed to comply, officers forced him to the ground and, after a brief struggle, placed him in handcuffs and escorted him outside. Officers did not observe or locate a knife on appellant's person or in the bedroom.

## II.     Initial Investigation and Sexual Assault Response Team (SART) Examination.

As appellant was being detained, other officers helped Maria to her feet, assisted her in walking to the living room, and sat her on a couch. While officers questioned Maria about what happened, she cried, appeared frightened and frantic, and had difficulty maintaining her composure. Maria told the officers that appellant entered her room, blocked the door, got naked, took her clothes off, and sexually assaulted her. She stated appellant got on top of her and "was raping" her, doing "whatever he wanted." She also

4.

specified that at one point, appellant pulled her head downward by pulling her hair and attempted to put his penis in her mouth.

While Maria was speaking with the officers, medical personnel arrived and began attending to her. She complained that appellant had injured her leg and pointed out abrasions on her left knee and shin. She also stated that appellant struck her in the stomach and ribs. Both Felipe and Miguel testified that she appeared to be in pain.

Maria agreed to undergo a SART examination and was transported to the hospital. She told the nurse examiner that she had been punched in the head and that her back forcefully struck the floor during the sexual assault. She reported pain to her head and to her left leg from the knee below. The nurse observed abrasions on Maria's left knee and shin.

During the vaginal examination, the nurse examiner observed a laceration to the posterior fourchette, five to nine millimeters in length, consistent with Maria having been sexually assaulted. The nurse noted that the examination had to be performed slowly because Maria had decreased range of motion in her hips and had difficulty opening her legs. According to the nurse, Maria did not appear to be in pain during this part of the examination.

The nurse examiner testified that she did not observe any signs suggesting Maria had sustained a bone fracture. However, she acknowledged that she may not have been able to detect a partial fracture. She explained that individuals can sustain partial fractures without realizing it and may still be able to bear weight on the affected limb.

Following the SART examination, Maria was able to dress herself and walk out of the facility with the assistance of her walker. She was transported to the police department and interviewed by a detective. Throughout the interview, Maria was shaking, highly emotional, and frequently cried. She told the detective her entire body was hurting and that she was extremely tired.

## III.     Fall, Hospitalization, and Surgery.

Maria was transported home after the interview.  She was still very emotional and complaining of leg pain.  Miguel testified she was not her usual self and appeared unwell, fragile, and very affected by what had happened to her.

Later that day, around noon, Felipe and Miguel went to the grocery store, leaving Maria alone in the house.  When they returned about 20 minutes later, they found Maria lying on the floor near the doorway between the kitchen and the living room.  They lifted Maria off the floor and helped her onto the couch.  According to Miguel, Maria stated that she went to prepare coffee and "slipped" as she entered the kitchen.  She was in severe pain and unable to walk but did not want to go to the hospital.  Several other family members came to the residence, and one eventually called for an ambulance.  Paramedics arrived at 7:00 p.m. and transported Maria to the hospital.

At the hospital, X-rays revealed a complete fracture to Maria's upper left femur near the hip, and she was referred to an orthopedic surgeon.  The surgeon testified that the fracture was comminuted, meaning the bone was broken into multiple fragments, and that Maria had osteoporosis, a condition that renders bones more susceptible to fracture.  Based on these findings, the surgeon determined Maria needed surgery, which involved inserting a rod into the femur.

In response to a hypothetical question, the orthopedic surgeon opined that if an 85-year-old person fell from a bed two to three feet off the ground, the force of impact could cause a hairline fracture of the femur.  He explained that a hairline fracture is one in which the bone is fractured but not displaced, and that a person with such an injury will experience pain but may not realize a fracture has occurred.  He further testified that the fracture could worsen if the person continued to bear weight on the leg or sustained an additional fall.  On cross-examination, the surgeon opined that Maria "probably" sustained the fracture in one incident.

The surgery to repair Maria's femur was completed on November 25, 2021, the day after her admission to the hospital, and there were no immediate complications.

## IV. Postoperative Complications and Death.

The day after surgery, while Maria was still recovering in the hospital, doctors observed episodes of an elevated heart rate. Further evaluation revealed a pulmonary embolism, or blood clot in her lung. Doctors administered blood thinning medications to combat the blood clot and decrease the risk of stroke.

On December 1, 2021, Maria was referred to a pulmonologist because her supplemental oxygen requirements had increased beyond what was expected. The pulmonologist expressed concern that the blood clot was large enough to cause pulmonary infarction, or death of lung tissue, and recommended Maria continue on blood-thinning medications.

Maria's hemoglobin levels began to decline on December 2, 2021, and by December 5, she had become dangerously anemic. Her attending physician testified that anemia of this nature is often caused by blood loss from internal bleeding, which can be exacerbated by blood-thinning medications. That same day, Maria underwent an endoscopy, which revealed multiple ulcers in her small intestine near the stomach. Although no active bleeding was observed, the physician placed clips on the ulcers to prevent current or future bleeding. Maria was taken off blood-thinning medications and treated with medications to reverse anticoagulation, increase iron levels, and stimulate red blood cell production. Doctors recommended Maria receive a blood transfusion, but she refused due to her religious beliefs.[2]

Over the next 12 hours, Maria's condition continued to deteriorate. She was admitted to the ICU and given medication to maintain her blood pressure. A CT scan of her chest, abdomen, and pelvis was performed, but there was no evidence of internal

---

[2] Maria's daughter testified that Maria was a devout Jehovah's Witness.

bleeding. The interventional radiologist recommended against embolization because the source of any active bleeding could not be identified, and her condition was unstable. At midnight on December 6, 2021, Maria suffered cardiopulmonary arrest and passed away.

## V. Testimony of the Prosecution's Forensic Pathologist.

Dr. E. Carpenter, a forensic pathologist with the Kern County Coroner's Office, testified regarding Maria's cause and manner of death. In forming his opinions, he reviewed the autopsy report, hospital records, the SART examiner's report, and reports written by a forensic pathologist retained by appellant.[3]

Dr. Carpenter opined that the cause of death was "complications of blunt force trauma." The injuries contributing to her death included the physical and psychological trauma sustained during the sexual assault, the subsequent fall in her home, and the surgery required to repair her fractured hip. He concluded the manner of death was "medical homicide," meaning a death caused, in whole or in part, by the acts of another.

Dr. Carpenter explained that Maria had several preexisting medical conditions that contributed to the complications arising from the blunt force trauma. He observed that she had an enlarged, overly muscular heart, likely resulting from years of high blood pressure and morbid obesity. This condition rendered her heart more fragile, impaired its ability to circulate blood effectively, and increased her susceptibility to arrhythmia. Maria also had preexisting ulcers in her small intestine, which began bleeding after she was admitted to the hospital.

Dr. Carpenter opined that the physical and psychological trauma of the sexual assault was highly likely to have caused an acute stress reaction, placing Maria in a state of "traumatic shock." This condition triggered the release of adrenaline and other stress-related chemicals, which had a deleterious effect on her frail heart and other organs. He

---

[3]    The forensic pathologist who performed the autopsy on Maria's body passed away before trial.

further explained that stress and trauma of this nature can produce an "easy bleeding" condition by impairing the body's ability to clot, thereby increasing the likelihood that preexisting ulcers will reopen. Carpenter noted, however, that the trauma from the fall, the subsequent surgery, and anesthesia also adversely affected Maria's heart, and may also have contributed to the reopening of her bleeding ulcers.

Dr. Carpenter was unable to offer a definitive opinion regarding the cause of Maria's fall in her home following the sexual assault. He noted that Maria had been experiencing left knee pain prior to the fall, a symptom consistent with a hairline fracture in the femur near the hip, but the evidence was insufficient to conclusively determine she had sustained such a fracture. He further observed that Maria's state of traumatic shock may have contributed to the fall. But absent definitive proof, Carpenter based his opinion regarding the cause of death on the "conservative" assumption that the fall was purely accidental.

Following surgery to repair her fractured femur, Maria developed an elevated heart rate, which Dr. Carpenter explained was consistent with the trauma of the sexual assault having placed additional strain on her already frail heart, contributing to its failure. Her preexisting ulcers began bleeding shortly after her hospital admission, also consistent with the trauma of the sexual assault and subsequent surgery. The resulting blood loss caused severe anemia, further taxing her heart and directly contributing to her death. Carpenter opined that Maria "probably" would have survived her hospital stay had she accepted a blood transfusion, but acknowledged that, given her age, overall health, and the effects of the trauma, such a conclusion was uncertain.

Dr. Carpenter ultimately concluded that Maria's death resulted from complications arising from the combined effects of the sexual assault, the fall, and subsequent surgery, together with her preexisting medical conditions. On cross-examination, he acknowledged that he could not quantify the relative contribution of the sexual assault to

9.

her death compared with the other factors, but he maintained that the medical evidence supported the conclusion that the sexual assault was a contributing cause.

## VI. Appellant's Statement and DNA Evidence.

Detectives interviewed appellant at the police station shortly after his arrest. A video recording of the interview was admitted into evidence and played for the jury.

Appellant admitted he used methamphetamine two days prior to his arrest. He stated he went into the house because he believed his ex-girlfriend and her children had been kidnapped and were being held hostage there. He went into a bedroom and found a lady sleeping on a bed. He put a chair in front of the door so they could talk "peacefully."

Appellant initially denied engaging in sexual activity, claiming that he blacked out. Later, he stated that the lady requested that they act like they were having sex to get some other unspecified people in the house to leave. He got behind her on the bed while she was on all fours and thrusted at her. The lady then moved to the floor, and he continued thrusting at her from behind. He acknowledged his penis was erect but denied vaginal penetration. He claimed the lady kept telling him to go "harder," and he obliged, and did not stop until the lady told him he had hurt her leg. Appellant also admitted to briefly orally copulating her vagina.

Following the interview, appellant underwent a SART examination, during which swabs were collected from his body for DNA analysis. DNA swabs were also collected from various parts of Maria's body during her SART examination. Subsequent testing revealed that appellant could not be excluded as a contributor to the DNA recovered from Maria's left breast, and that Maria could not be excluded as a contributor to the DNA recovered from appellant's penis.

**VII. Defense Evidence.**

A court appointed psychologist testified he interviewed appellant on several occasions. He diagnosed appellant with unspecified schizophrenia spectrum disorder and methamphetamine induced psychosis.

A forensic pathologist retained by the defense opined that Maria's femur fracture was caused by her fall rather than the alleged sexual assault. She testified there was no "mechanism" in the act of sexual assault that would produce such a fracture. While she acknowledged that a fall from a bed could cause an 85-year-old to sustain a partial fracture, she stated that she would defer to an orthopedic surgeon on that issue. She further testified there was no evidence in the medical records or autopsy of any preexisting heart condition, disputing the methodology used by Dr. Carpenter to conclude that Maria had an enlarged or overly muscular heart.

The defense pathologist rejected Dr. Carpenter's conclusion that the manner of death was medical homicide, maintaining that nothing related to the sexual assault caused the femur fracture that ultimately led to Maria's death. Instead, in her view, every complication stemmed from the fall and the subsequent surgery. These complications included a pulmonary embolism, which she described as a common consequence following a femur fracture, as well as bleeding ulcers and possible pneumonia. She also rejected Carpenter's assertion that the trauma of the sexual assault negatively impacted Maria's heart, noting there were no signs of cardiac abnormality until after surgery and no medical evidence linking the death to cardiac strain caused by the alleged assault.

## DISCUSSION

**I. Substantial Evidence Supported Appellant's Felony-Murder Conviction.**

Appellant was convicted of felony murder under the theory that he was the "actual killer." (§ 189, subd. (e)(1).) He challenges the sufficiency of the evidence to sustain his conviction on two separate but related grounds. First, he claims the evidence was insufficient that he was the "actual killer." He argues there was no evidence, or

11.

argument, at trial that he "personally committed any act that directly caused [Maria's] death," because the prosecution's sole theory at trial was that his act of sexually assaulting Maria was "one of many proximate causes" of death. Second, he asserts that, if actual killer liability does apply where there are multiple causes of death, the evidence did not support the jury's finding that his sexual assault was a substantial factor in causing Maria's death.

### A.    *Felony murder and the actual killer requirement (§ 189, subd. (e)(1)).*

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) "significantly narrowed the scope of the felony-murder rule." (*People v. Strong* (2022) 13 Cal.5th 698, 703.) Prior to its enactment, a defendant was liable for first degree murder for any killing committed by the defendant or an accomplice during the commission of a qualifying felony. (Former § 189; see *Strong*, at p. 703.) "Under the new felony-murder rule, participation in a qualifying felony in which a death occurs is no longer sufficient to justify liability for first degree murder." (*People v. Lopez* (2023) 88 Cal.App.5th 566, 574.)

"As relevant here, the amended murder statute now limits felony-murder liability to: (1) 'actual killer[s]' (§ 189, subd. (e)(1)); (2) those who, 'with the intent to kill,' aided or abetted 'the actual killer in the commission of murder in the first degree' ([§ 189], subd. (e)(2)); and (3) 'major participant[s] in the underlying felony' who 'acted with reckless indifference to human life' ([§ 189], subd. (e)(3))." (*People v. Wilson* (2023) 14 Cal.5th 839, 868–869.) Thus, for accomplices, section 189, subdivision (e) limits felony-murder liability to those who act with a heightened mental state. (§ 189, subd. (e)(2)–(3).) However, "section 189 provides no additional or heightened mental state requirement for the 'actual killer' prosecuted under a felony-murder theory; it requires only that '[t]he person was the actual killer.' (§ 189, subd. (e)(1).)" (*People v.*

*Garcia* (2022) 82 Cal.App.5th 956, 967 (*A. Garcia*); accord, *People v. Jackson* (2016) 1 Cal.5th 269, 347 [addressing actual killers under section 190.2, subd. (b)].)

"[T]he term 'actual killer' is meant to distinguish the person who actually caused the victim's death, including in circumstances where two or more persons participated in the felony." (*A. Garcia*, *supra*, 82 Cal.App.5th at p. 968.) The term is used to describe the person who "personally killed" the victim. (*People v. Jennings* (1988) 46 Cal.3d 963, 979; see *People v. Garcia* (2020) 46 Cal.App.5th 123, 151 (*J. Garcia*); *People v. Lopez* (2022) 78 Cal.App.5th 1, 4 (*Lopez*); *People v. Vang* (2022) 82 Cal.App.5th 64, 91 (*Vang*).) Thus, "the meaning of 'actual killer' … is literal. The actual killer is the person who personally kills the victim, whether by shooting, stabbing, or" other means. (*J. Garcia*, at p. 152; see *Vang*, at p. 88 [the " 'actual killer' " is "the actual perpetrator of the killing, i.e., the person (or persons) who personally committed the homicidal act"].)

## B. *Standard of review.*

"To determine the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the prosecution to determine whether it contains [substantial] evidence that is reasonable, credible and of solid value, from which a rational trier of fact could find that the elements of the crime were established beyond a reasonable doubt." (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.) We "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "We need not be convinced of the defendant's guilt beyond a reasonable doubt; we merely ask whether ' "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*Tripp*, at p. 955, italics omitted.) Further, "a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

## II. Substantial Evidence Supported the Jury's Finding that Appellant Was the "Actual Killer."

It is beyond dispute that appellant, acting alone, assaulted and violently raped Maria. Despite this, appellant claims he was not the "actual killer," because, at most, his acts were "one of many proximate causes that—in the aggregate—ultimately led to [Maria's] death." He argues the evidence overwhelmingly established the "direct" cause of death was the bleeding ulcers that occurred following surgery, and thus, there was no evidence he "personally committed the homicidal act that directly caused [Maria's] death."

In *A. Garcia*, a factually similar case, the court rejected a similar claim. There, the defendant robbed and physically assaulted an 82-year-old man, who died about one hour later from a lethal cardiac arrythmia. (*A. Garcia*, *supra*, 82 Cal.App.5th at pp. 961–962.) A forensic pathologist opined that, due to the victim's preexisting cardiovascular disease, either the stress of the robbery or the assault triggered the lethal arrythmia, which was the immediate cause of death. (*Id.* at pp. 961–962 & fn. 4.) The defendant was convicted of first degree murder under a felony-murder theory. (*Id.* at p. 960.)

On appeal from the denial of a section 1172.6 resentencing petition,[4] the defendant argued there was no " 'actual killer' " within the meaning of section 189, subdivision (e)(1), because the victim's death resulted from the stress of the underlying felony aggravating a preexisting medical condition. (*A. Garcia*, *supra*, 82 Cal.App.5th at pp. 966–967.) The court disagreed, reasoning that nothing in the plain language of section 189 suggests the addition of the actual killer requirement modified "the long-standing rules regarding felony-murder liability in circumstances involving concurrent causes of death, including situations in which the victim's preexisting medical condition

---

[4] Section 1172.6 is a "special procedural mechanism" that allows those convicted of murder, attempted murder, or manslaughter under the law as it existed prior to the enactment of Senate Bill No. 1437 to "seek retroactive relief under the law as amended." (*People v. Strong*, *supra*, 13 Cal.5th at p. 708.)

14.

is a substantial factor in causing the death." (*A. Garcia*, at p. 967.) The court also observed that the legislative history of Senate Bill No. 1437 "contains no expressed intent to modify the felony-murder rule's application to a perpetrator whose acts were a concurrent cause of the death." (*A. Garcia*, at p. 967.) Because the record conclusively showed the "defendant, acting alone, committed the acts against [the victim] that directly contributed to [his] lethal cardiac arrhythmia," the court concluded he " 'personally killed' " the victim and thus qualified as the " 'actual killer.' " (*Id.* at pp. 970, 971)

As *A. Garcia* makes clear, the designation "actual killer" does not turn on whether the perpetrator's acts were the immediate, sole, or even primary cause of death. Rather, it is well settled that where there is evidence of concurrent causes of death, the actus reus element of murder is satisfied if the defendant's act was a "substantial factor contributing" to the death. (*People v. Carney* (2023) 14 Cal.5th 1130, 1138 (*Carney*); see *People v. Jennings* (2010) 50 Cal.4th 616, 643 (*Jennings*).) "[A]s long as the jury finds that without the criminal act the death would not have occurred when it did, it need not determine which of the concurrent causes was the principal or primary cause of death." (*People v. Catlin* (2001) 26 Cal.4th 81, 155 (*Catlin*); see *Jennings*, at p. 643.) "This is true even if the victim's preexisting physical condition also was a substantial factor causing death." (*Catlin*, at p. 155.) We agree with *A. Garcia* that the addition of the "actual killer" requirement to the felony-murder rule did not alter these fundamental causation principles. (*A. Garcia*, *supra*, 82 Cal.App.5th at pp. 967–968.)

Appellant relies on *J. Garcia, Lopez*, and *Vang* in support of his assertion that the "actual killer" is not "any person whose act was one of the many proximate causes of the victim's death." However, these authorities merely illustrate that actual killer liability requires that the fatal injury result directly from the acts of the perpetrator, rather than from an accomplice or some other person. In *J. Garcia*, the court determined the perpetrator of a home invasion robbery was not the actual killer where he provided duct tape to a coparticipant, who then used it to bind the victim's head, causing death by

15.

asphyxiation.[5] (*J. Garcia*, *supra*, 46 Cal.App.5th at pp. 149–151.) Observing that " '[p]roximately causing and personally inflicting harm are two different things,' " the court concluded that "only the person (or people) who placed the duct tape on [the victim's] mouth were actual killers." (*Id.* at pp. 151, 150, fn. omitted, 155.) Similarly, in *Lopez,* the court held the perpetrator of a home invasion robbery was not the actual killer if the evidence showed that only his coparticipant delivered the fatal blows to the victim. (*Lopez*, *supra*, 78 Cal.App.5th at p. 20.) In *Vang*, the court held the perpetrator of a kidnapping was not an actual killer where the victim jumped from a moving vehicle. (*Vang*, *supra*, 82 Cal.App.5th at pp. 69–70, 80.) In the court's view, the evidence did not "permit any inference that [the] defendant was the direct cause of" death because the victim jumped from the car on her own volition. (*Id.* at pp. 80, 91.)

These matters are readily distinguishable because here, the evidence conclusively established appellant personally assaulted and raped Maria. Moreover, contrary to appellant's assertion, these cases do not suggest that actual killer liability is precluded simply because the perpetrator's acts were one of multiple contributing causes of death.

Consistent with *A. Garcia*, we conclude the evidence supported the jury's finding that appellant was the "actual killer" under section 189, subdivision (e)(1), because he personally assaulted and raped Maria, which, as we explain below, directly contributed to and were a substantial factor in causing her death. (*A. Garcia*, *supra*, 82 Cal.App.5th at pp. 970–971.) For purposes of assessing actual killer liability, it is immaterial that other factors, including Maria's preexisting health conditions, fall, and complications from surgery, also substantially contributed to her death. Accordingly, appellant's conviction

---

[5]     *J. Garcia* addressed whether the defendant qualified as an "actual killer" for purposes of a robbery-murder special-circumstance allegation (§ 190.2, subds. (a)(17), (b)), a standard that largely mirrors the actual killer requirement for general-felony murder liability. (See *Lopez*, *supra*, 78 Cal.App.5th at p. 19.)

under the actual killer theory of felony murder was supported by substantial evidence, and we reject this claim.

### III. Substantial Evidence Supported the Jury's Finding that Appellant's Felonious Conduct Was a Substantial Factor in Causing Maria's Death.

An act causes death if the death is the direct, natural, and probable consequence of the act, and the death would not have occurred without it. (*People v. Cervantes* (2001) 26 Cal.4th 860, 866; *Carney*, *supra*, 14 Cal.5th at p. 1138; see CALCRIM Nos. 240, 520.) A natural and probable consequence is one that a reasonable person would know is likely to occur if nothing unusual intervenes. (*Carney*, at p. 1143; *People v. Roberts* (1992) 2 Cal.4th 271, 321–322; *People v. Fiu* (2008) 165 Cal.App.4th 360, 372 [consequence must be "reasonably foreseeable"].)

As discussed above, murder liability does not require that the defendant's actions be the sole cause of death. (*Carney*, *supra*, 14 Cal.5th at p. 1138, *Jennings*, *supra*, 50 Cal.4th at p. 643; *Catlin*, *supra*, 26 Cal.4th at p. 155.) Where the evidence shows multiple causes of death, the causation element of murder is satisfied if the defendant's acts were "a substantial factor contributing to the [death], rather than insignificant or merely theoretical." (*Jennings*, at p. 643; see CALCRIM Nos. 240, 520.) Relevant here, a victim's preexisting physical or medical condition does not preclude murder liability, even where that condition is a substantial factor in causing death, so long as it is not the sole substantial factor. (*Catlin*, at pp. 155–156; *A. Garcia*, *supra*, 82 Cal.App.5th at p. 964.)

The jury was instructed in accordance with these principles and found beyond a reasonable doubt that appellant's acts were a "direct, natural, and probable consequence" of death, and a "substantial factor in causing the death." (See CALCRIM No. 520.)[6]

---

[6] The jury was not instructed with CALCRIM No. 520, but the applicable language regarding causes of death was incorporated into its instruction on felony murder. The

Appellant contends that no reasonable jury could have made this finding. Having carefully reviewed the record in its entirety, we disagree. The significant physical and psychological injuries Maria sustained as a result of appellant's violent acts, coupled with Dr. Carpenter's expert testimony and opinion that her death was a "medical homicide" caused by the combined effects of the rape and assault, the fall, and the subsequent surgery, provided a sufficient basis for the jury to find that appellant's conduct was a substantial factor in causing her death.

Appellant raped and assaulted Maria in an especially violent and brutal manner. He entered her house in the middle of the night, ambushed her in her room while she was asleep, and barricaded the door behind him. He punched her in the head and torso, pulled her by the hair, and caused her back to strike the floor forcefully. In appellant's words, he vigorously and repeatedly thrusted at her from behind, first on the bed, then on the floor, and did not stop until she told him he had injured her leg.

The record clearly reflects the physical and psychological trauma that appellant inflicted on Maria. Before the police entered her room, they could hear her repeatedly screaming for help. When officers broke down the door, they found her lying on the floor, consistent with having been pulled or knocked off her bed. While speaking to the officers, she was crying, frantic, and inconsolable. She remained in that condition over the next several hours, crying and shaking throughout her interview with detectives at the police station, and reporting that she was tired and in pain throughout her body. Even after she returned home, before her grandsons left for the store, she still appeared to be in a fragile and emotional state. This evidence was consistent with Dr. Carpenter's testimony that Maria was very likely in a state of traumatic shock, which is characterized by "sadness, depression, disbelief, and disorientation."

---

jury was also instructed pursuant to CALCRIM No. 240, which sets forth the same fundamental principles governing causation in criminal cases.

Appellant notes that the only visible external injuries Maria sustained from the rape and assault were abrasions on her left knee and shin, as well as a tear to her posterior fourchette. However, the record strongly suggests that her injuries were more than superficial. Maria was still able to walk with the assistance of her walker, but she complained repeatedly of pain to her left leg and knee. These complaints persisted even after she returned home from the police station, hours after the sexual assault. While the record does not conclusively establish the precise nature of her leg injury at that time, there was evidence suggesting she may have sustained a partial or hairline fracture of her femur during the sexual assault. But even absent such a fracture, the duration and apparent intensity of her leg pain indicated that her injuries were more severe than superficial abrasions.

Accordingly, when Maria fell, her physical and mental condition was clearly impaired as a result of appellant's conduct. Her leg was injured, her body was in pain, and she remained affected by the trauma of the rape and assault. Based on Dr. Carpenter's testimony, the jury could have reasonably inferred that Maria was in a state of traumatic shock at the time of the fall that compromised her ability to safely navigate her surroundings. On this evidence, the jury could reasonably have found that the combined effects of the physical and psychological injuries directly resulted in her fall and the resulting femoral fracture.

Appellant contends that the only direct evidence of the cause of Maria's fall was her statement to Miguel that she "slipped" while entering the kitchen, and that she did not state that she fell as the result of leg pain or her psychological state. This brief statement was made shortly after the fall, when Maria had just sustained a significant injury, and there is no indication she addressed the underlying causes of the fall in any meaningful detail. As such, the statement did little to substantiate the conclusion that the fall was purely accidental. At most, it gave rise to a competing inference regarding the cause of the fall, which the jury was entitled to reject. (See *People v. Tice* (2023) 89 Cal.App.5th

246, 256 [the existence of competing inferences does not defeat the sufficiency of the evidence].)

In addition to causing the fall, the jury could reasonably have found that the assault and rape directly contributed to Maria's surgical complications and the exacerbation of her underlying health conditions. Dr. Carpenter testified that the trauma of the sexual assault triggered the release of chemicals that had a deleterious effect on her already frail heart, contributing to its failure. He further explained that this trauma may have caused her preexisting ulcers to reopen and bleed, and that the resulting blood loss placed additional strain on her heart, likewise contributing to her death. While Carpenter conceded that Maria's subsequent fall and surgery would also have produced similar effects, he maintained that the direct impact of the sexual assault on her body was a contributing cause of death.

Appellant argues that Maria's death was not a direct, natural, and probable consequence of his actions, asserting that "[n]o reasonable person would believe that causing an abrasion on an elderly person's lower leg would cause that person to later slip and fall then die as a result of bleeding ulcers and the refusal of lifesaving measures." As we have explained, the evidence established appellant's conduct caused more than superficial injuries to Maria's leg. In any event, we are unpersuaded that Maria's fall, hospitalization, and death from surgical complications and underlying health conditions were not reasonably foreseeable consequences of appellant's brutal rape and assault of an already frail 85-year-old woman. In other words, Maria's fall and fatal health complications were not "unforeseeable and extraordinary occurrence[s]."[7] (*People v. Crew* (2003) 31 Cal.4th 822, 847.)

---

[7] To the extent appellant contends that Maria's refusal to accept a blood transfusion on religious grounds relieved him of responsibility for her death, we disagree. The evidence was far from conclusive that a transfusion would have saved her life. Regardless, we are not persuaded that, as a matter of law, Maria's refusal to consent to a particular medical procedure necessitated by injuries resulting from appellant's violent

In sum, the record amply supports the jury's finding that appellant's felonious conduct directly caused and substantially contributed to Maria's death. Although there was evidence of other concurrent causes, the jury could reasonably have found that the violent assault and rape directly contributed to her fall and the complications that followed surgery and, thus, were a substantial factor in bringing about her death. We therefore conclude that appellant's felony-murder conviction is supported by substantial evidence, and this claim fails.

## IV. Any Instructional Error Regarding the Actual Killer Requirement Was Harmless Beyond a Reasonable Doubt.

In addition to his substantial evidence claim, appellant contends the trial court failed to properly instruct the jury on the "actual killer" element of the applicable theory of felony murder. (§ 189, subd. (e)(1).) He contends the court omitted an essential element of the offense by failing to instruct that the prosecution was required to prove beyond a reasonable doubt that he "personally committed" acts that "directly caused" Maria's death, and that this omission requires reversal.[8]

### A. *Background.*

The trial court instructed the jury on the elements of felony murder as follows, in pertinent part:

---

conduct constituted an "unforeseeable[,] … extraordinary and abnormal occurrence" relieving appellant of murder liability. (*People v. Armitage* (1987) 194 Cal.App.3d 405, 420–421; see *People v. Roberts*, *supra*, 2 Cal.4th at p. 312 [where a person inflicts a life-threatening injury, inadequate medical treatment is not an "unforeseeable intervening cause" unless grossly improper and the sole cause of death].) Rather, the jury was entitled to find her refusal was " 'a normal and reasonably foreseeable result of [appellant's] original act[s].' " (*Armitage*, at p. 420.)

[8] Consistent with his substantial evidence claim, appellant also asserts that the instructions erroneously permitted the jury to convict him of felony murder "so long as they found the sexual assault was one of many proximate causes of [Maria's] death." As we have explained, the actual killer requirement does not preclude liability where there is evidence of multiple causes of death. Because this contention rests on the same flawed legal premise, we need not address it further.

"[Appellant] is charged in Count 1 with first degree murder, under a theory of felony murder.

"To prove that [appellant] is guilty of first degree murder under [a theory of felony murder], the People must prove that:

"1.    [Appellant] committed or attempted to commit rape, sodomy, oral copulation, and/or burglary;

"2.    [Appellant] intended to commit rape, sodomy, oral copulation, and/or burglary;

"AND

"3.    The commission or attempted commission of the rape, sodomy, oral copulation, and/or burglary was a substantial factor in causing the death of another person."[9]

The trial court also instructed the jury on the elements of the special circumstance allegations applicable to the murder count. The instruction provided, in pertinent part:

To prove that this special circumstance is true, the People must prove that:

"1.    [Appellant] committed or attempted to commit rape, sodomy, oral copulation, and/or burglary;

"2.    [Appellant] intended to commit rape, sodomy, oral copulation; and/or burglary;

"AND

"3.    [Appellant] personally committed the acts that directly caused the death of another person."

The jury was also instructed that each special circumstance allegation "must be decided separately."

---

[9]    Appellant did not object to this instruction. However, respondent agrees, as do we, that that his instructional error claim is not forfeited. (See § 1259; *People v. Hillhouse* (2002) 27 Cal.4th 469, 503 ["Instructions regarding the elements of the crime affect the substantial rights of the defendant, thus requiring no objection for appellate review"]; *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7; *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7.)

**B.** *Any presumed error was harmless.*

We agree with appellant that the trial court did not explicitly instruct the jury that his felony-murder conviction required a finding that he was the "actual killer," or otherwise convey that requirement in equivalent terms. Notably, CALCRIM No. 540A, which pertains to the actual killer theory of felony murder, includes the following element: "While committing [or attempting to commit] [the applicable felony], the defendant *personally committed* [acts] that *directly caused* the death of another person." (Italics added.)

However, we need not determine whether the failure to instruct in this manner was erroneous, because any presumed error was harmless. The prejudicial effect of the omission of an element of an offense is subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24. (*Neder v. United States* (1999) 527 U.S. 1, 4; *People v. Mil* (2012) 53 Cal.4th 400, 409.) Under this standard, we may affirm the jury's verdict despite the error if "it appears beyond a reasonable doubt that the error did not contribute to the particular verdict at issue." (*People v. Sakarias* (2000) 22 Cal.4th 596, 625.) In conducting this review, we thoroughly examine the entire record to determine whether it "contains evidence that could rationally lead to a contrary finding with respect to the omitted element." (*Neder*, *supra*, 527 U.S. at p. 19.) We also consider "what the jury, properly instructed, necessarily found," and ask whether a "reasonable jury that made all of these findings could have failed to find" the omitted element. (*People v. Merritt* (2017) 2 Cal.5th 819, 832; see *In re Lopez* (2023) 14 Cal.5th 562, 580; *People v. Chun* (2009) 45 Cal.4th 1172, 1204–1205.)

In addition to convicting appellant of felony murder, the jury also found true special circumstance allegations for murder in the commission or attempted commission of rape, sodomy, oral copulation, and burglary. (§ 190.2, subds. (a)(17)(C), (a)(17)(D), (a)(17)(F), (a)(17)(G).) These special circumstance allegations carried an "actual killer" requirement that largely mirrors section 189, subdivision (e)(1). (§ 190.2, subd. (b); see

*Lopez, supra,* 78 Cal.App.5th at p. 19.) Consistent with this requirement, the jury was instructed that, to find the allegations true, it had to find beyond a reasonable doubt that, in the commission of the applicable felony, appellant "personally committed the acts that directly caused the death of another person."

Based on these special circumstance findings, which arose from the same criminal conduct as the underlying felony-murder charge and included the same language appellant claims was erroneously omitted from the felony-murder instruction, the jury necessarily found that appellant was the "actual killer" as defined by section 189, subdivision (e)(1). We therefore conclude the purported error was harmless, because "other aspects of the verdict … leave no reasonable doubt that the jury made the findings necessary" to establish the omitted element. (*People v. Chun, supra,* 45 Cal.4th at p. 1205.) Put differently, no reasonable jury that found appellant "personally committed" acts that "directly caused" Maria's death for purposes of the special circumstance allegations could have failed to make the same finding with respect to the felony-murder charge. (See *People v. Merritt, supra,* 2 Cal.5th at p. 832.) Accordingly, the record establishes beyond a reasonable doubt that the purported error did not contribute to the verdict, and this claim fails. (See *People v. Sakarias, supra,* 22 Cal.4th at p. 625.)

## V. Maria's Initial Statements to Law Enforcement Were Nontestimonial. Admission of the Statements Did Not Violate Appellant's Sixth Amendment Right to Confrontation.

The trial court granted the People's motion to admit statements Maria made to law enforcement in her home in the immediate aftermath of the sexual assault. Appellant contends the statements were testimonial hearsay admitted in violation of his Sixth Amendment right to confrontation. (*Crawford v. Washington* (2004) 541 U.S. 36.)

### A. *Background.*

The People moved in limine to admit Maria's initial statements when the officers first contacted her in her bedroom then spoke with her in her living room. The statements

were captured on the body worn cameras of various responding officers. Video recordings from the body worn cameras were ultimately admitted into evidence at trial and played for the jury.

The videos show officers breaking down the door to Maria's room, apprehending appellant, and assisting Maria from the ground into the living room. There, officers informed her that an ambulance was on its way and asked her to explain "what happened." Maria appeared visibly shaken and emotional, and had difficulty maintaining her composure and providing coherent, responsive answers. She eventually explained that an unknown man entered her room while she was in bed, blocked the door, and sexually assaulted her. The interaction lasted approximately 10 minutes, after which paramedics arrived and began rendering aid.

The People argued Maria's hearsay statements were admissible under the spontaneous statement exception (Evid. Code, § 1240)[10] and were nontestimonial because the circumstances showed the officer's questioning was directed at addressing an ongoing emergency. Appellant countered that the statements were testimonial and violated his right to confrontation.

The trial court granted the motion and admitted Maria's statements under Evidence Code section 1240. The court also ruled the statements were nontestimonial, reasoning that the officers' questioning was directed at addressing an ongoing emergency, assessing Maria's condition, and determining what aid or assistance she required. The court further explained that the questioning lacked "formality or solemnity characteristics of testimony," consistent with statements obtained for a purpose other than

---

[10] Evidence Code section 1240 provides a hearsay exception for statements that "narrate, describe, or explain an act, condition, or event perceived by the declarant," and are "made spontaneously while the declarant was under the stress of excitement caused by such perception."

gathering evidence for later criminal prosecution, and that Maria "did not have an opportunity to deliberate about what she would tell law enforcement."

### B. *Applicable Law and Standard of Review.*

"The confrontation clause of the Sixth Amendment to the federal Constitution, made applicable to the states through the Fourteenth Amendment, provides that '[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him.' " (*People v. Fletcher* (1996) 13 Cal.4th 451, 455.) In *Crawford,* the United States Supreme Court "held that, in general, admission of 'testimonial' statements of a witness who was not subject to cross-examination at trial violates a defendant's Sixth Amendment right of confrontation, unless the witness is unavailable, and the defendant had a prior opportunity for cross-examination." (*People v. Rangel* (2016) 62 Cal.4th 1192, 1214.) "Although the court in *Crawford* 'did not offer an exhaustive definition of "testimonial statements," the court has since clarified that 'a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial' [citation] — that is to say, unless the statements are given in the course of an interrogation or other conversation whose ' "primary purpose … is to establish or prove past events potentially relevant to later criminal prosecution." ' " (*Ibid.*) "In the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.' " (*Ohio v. Clark* (2015) 576 U.S. 237, 245.)

"The primary purpose test is essentially a totality of the circumstances analysis. '[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred.' " (*People v. Leon* (2016) 243 Cal.App.4th 1003, 1019–1020, quoting *Michigan v. Bryant* (2011) 562 U.S. 344, 360 (*Bryant*).)

"On appeal, we independently review whether a statement was testimonial so as to implicate the constitutional right of confrontation." (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466.)

### C. *Maria's statements to law enforcement immediately after the sexual assault were nontestimonial.*

"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." (*Davis v. Washington* (2006) 547 U.S. 813, 822.) "The existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than 'prov[ing] past events potentially relevant to later criminal prosecution.' [Citation.] Rather, it focuses them on 'end[ing] a threatening situation.' " (*Bryant*, *supra*, 562 U.S. at p. 361, fn. omitted.)

When officers arrived at Maria's residence, they were clearly confronted with an ongoing emergency. Officers had been informed that an intruder had entered Maria's bedroom and could hear her screaming for help from inside. After forcing entry through the barricaded door, officers found Maria, an octogenarian, on the ground and in clear distress. Appellant, a middle-aged man, was belligerently yelling, "[T]hat's my mom," and refused to comply with the officers' commands to get on the ground. While some officers detained appellant, others helped Maria to her feet and escorted her out of the room, presumably for her safety. Once in the living room, the officers promptly began asking Maria to explain what happened.

Appellant contends that the emergency necessarily ended when appellant was arrested and escorted from Maria's residence. But "[t]he existence of an ongoing emergency must be objectively assessed from the perspective of the parties to the interrogation at the time, not with the benefit of hindsight." (*Bryant*, *supra*, 562 U.S. at p. 361, fn. 8.) At that juncture, the responding officers were only generally aware that

appellant had entered Maria's residence and bedroom and barricaded himself inside, and it remained unclear whether anyone else was involved or any danger persisted. (*Id*. at pp. 363–364 [potential threat to the police, victim, and public relevant to existence of ongoing emergency].) Although Felipe indicated during the 911 call that the intruder was a stranger, officers had not yet confirmed whether appellant had any relationship to Maria or her grandsons. Appellant's repeated claims that Maria was his mother, though later shown to be false, contradicted the grandsons' initial report and added confusion to an already tense and chaotic scene. Further, while Maria's highly emotional state strongly suggested she had been victimized in some manner, the precise events that occurred inside her bedroom remained unclear. Given Maria's age and obvious frailty, the officers had reason to believe that, if she had been the victim of even relatively minor physical violence, immediate medical attention might be necessary even before paramedics arrived. Thus, when officers began questioning Maria, they faced both a potential threat to public safety and an ongoing medical emergency.

The record likewise demonstrates that the officers' primary purpose in questioning Maria was to address those emergencies. The questions were directed at determining what had occurred, who appellant was, and what he had done to her—questions necessary to assess the situation, evaluate Maria's medical condition, and determine whether any ongoing safety threats remained. (See *Bryant*, *supra*, 562 U.S. at p. 376 [scope of questioning limited to ongoing emergency].) The questioning was brief and not detailed, further reflecting that its purpose was to meet the exigencies of the moment rather than to establish facts for later prosecution.

The circumstances of the questioning also reveal the nontestimonial nature of Maria's statements. The questioning occurred in Maria's living room moments after officers rescued her from her bedroom. Throughout the questioning, Maria remained visibly distraught, repeatedly crying and struggling to maintain her composure and provide coherent responses. The questions were asked in an impromptu and disorganized

28.

manner, and in the presence of multiple other officers and Maria's grandsons. Maria's statements to officers under these "chaotic conditions," given under the stress of her recent trauma, lacked the " 'formality and solemnity characteristic of testimony.' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 816–817, 818; *People v. Cage* (2007) 40 Cal.4th 965, 985.) Rather, the circumstances of the exchange demonstrate that the officers' "primary purpose was simply to address what they perceived to be an ongoing emergency," and that Maria responded to the officers' questions without consideration of "the possible future prosecutorial use" of her statements. (*Bryant*, *supra*, 562 U.S. at p. 377.)

The record conclusively demonstrates that the officers questioned Maria during an ongoing emergency, and the primary purpose of the interaction was to address that emergency, not to create a substitute for trial testimony. (See *Ohio v. Clark*, *supra*, 576 U.S. at p. 245.) Therefore, Maria's statements were nontestimonial, and the trial court did not err in admitting them at trial. This claim is without merit.

## DISPOSITION

The judgment is affirmed.


LEVY, Acting P. J.

WE CONCUR:


FRANSON, J.


SNAUFFER, J.

29.